# 23-0804-cv

# United States Court of Appeals
## for the
# Second Circuit

40 DAYS FOR LIFE, a nonprofit corporation of the State of Texas,
WHITE PLAINS 40 DAYS FOR LIFE, as unincorporated association of the State
of New York, OKSANA HULINSKY, REGINA CREARY MOLINELLI,

*Plaintiffs-Appellants,*

JANE DOE, SALLY ROE,

*Plaintiffs,*

– v. –

COUNTY OF WESTCHESTER,

*Defendant-Appellee,*

COUNTY OF WESTCHESTER COUNTY DEPARTMENT
OF PUBLIC SAFETY, TERRANCE RAYNOR, Acting Commissioner of the
Westchester Department of Public Safety, in his official capacity, NEW
ROCHELLE POLICE DEPARTMENT, CITY OF WHITE PLAINS
DEPARTMENT OF PUBLIC SAFETY, GEORGE LATIMER, Chief Executive
of the County of Westchester, in his official capacity,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

MICHAEL MCHALE
THOMAS MORE SOCIETY
10506 Burt Circle, Suite 110
Omaha, Nebraska 68114
(402) 501-8586

CHRISTOPHER A. FERRARA
THOMAS MORE SOCIETY
148-29 Cross Island Parkway
Whitestone, New York 11357
(718) 357-1040

*Attorneys for Plaintiffs-Appellants*

CP COUNSEL PRESS    (800) 4-APPEAL • (623761)

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

REPLY TO DEFENDANT'S STATEMENT OF THE CASE....................2

ARGUMENT ...................................................................................12

   I.  Pre-Enforcement Standing. ...........................................12

    A.  Individual Plaintiffs. .............................................12

    B.  Organizational Plaintiffs. ............................................17

   II.  Plaintiffs Remain Likely to Succeed on the Merits. ......................18

    A.  Chapter 425 remains both facially content-based and underpinned with a content-based purpose. ..............................18

     1.  Chapter 425's facial content-based defects.............................19

     2.  Chapter 425's underlying purpose. ........................................24

    B.  Chapter 425 also still fails intermediate scrutiny. ......................28

    C.  Vagueness and Overbreadth.........................................30

   III. Remaining Factors. .......................................................35

    A.  Irreparable Harm. ..................................................35

    B.  Balance of Equities and Public Interest....................................36

CONCLUSION ..................................................................................36

# TABLE OF AUTHORITIES

## Cases

*303 Creative v. Elenis*,
  600 U.S. 570 (2023) ................................................................ 16

*40 Days for Life, et al. v. County of Westchester*,
  No. 23-155 (2d Cir. April 4, 2023) ........................................... 2

*Allentown Women's Ctr., Inc. v. Sulpizio*,
  403 F.Supp.3d 461 (E.D. Pa. 2019) ......................................... 22

*Animal Legal Def. Fund v. Wasden*,
  878 F.3d 1184 (9th Cir. 2018) ................................................. 26

*Animal Legal Def. Fund v. Kelly*,
  9 F.4th 1219 (10th Cir. 2021) ............................................ 23, 27

*Ashcroft v. Am. C.L. Union*,
  542 U.S. 656 (2004) ................................................................ 28

*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979) ................................................................ 13

*Brown v. City of Pittsburgh*,
  586 F.3d 263 (3d Cir. 2009) .................................................... 29

*Brown v. Kemp*,
  86 F.4th 745 (7th Cir. 2023) ........................... 15, 22, 27, 32, 34

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
868 F.3d 104 (2d Cir. 2017) ............................................................ 17, 18

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin*,
596 U.S. 61 (2022) .......................................................................... 22, 25

*City of Chicago v. Morales*,
527 U.S. 41 (1999) .................................................................................. 31

*City of Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986) .......................................................................... 25, 26

*Coates v. Cincinnati*,
402 U.S. 611 (1971) ............................................................................... 33

*Connecticut Parents Union v. Russell-Tucker*,
8 F.4th 167 (2d Cir. 2021) .................................................................... 17

*Counterman v. Colorado*,
600 U.S. 66 (2023) .................................................................................. 1

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022) ......................................................................... 21

*Dorman v. Satti*,
862 F.2d 432 (2d Cir. 1988)........................................... 20, 25, 26, 33

*Elrod v. Burns*,
427 U.S. 347 (1976) .............................................................................. 35

*Farrell v. Burke*,
449 F.3d 470 (2d Cir. 2006).................................................................. 29

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) ................................................. 30

*Frisby v. Shultz*,
   487 U.S. 474 (1988) ................................................. 20

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ................................................. 34

*Hill v. Colorado*,
   530 U.S. 703, 747-48 (2000) .............................. 2, 21

*Kolender v. Lawson*,
   461 U.S. 352 (1983) ................................................. 30

*Krueger v. City of Pensacola*,
   759 F.2d 851 (11th Cir. 1985) .............................. 25

*Madsen v. Women's Health Ctr.*,
   525 U.S. 754 (1994) ................................................. 28

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ...................................... *passim*

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   138 S. Ct. 2361 (2018) ........................................... 23

*Nat'l Org. for Marriage, Inc. v. Walsh*,
   714 F.3d 672 (2d Cir. 2013) ................................. 15

*New York Progress & Prot. v. Walsh*,
   733 F.3d 483 (2d Cir. 2013) ................................. 35

iv

*New York v. Griepp,*
 991 F.3d 81 (2d Cir.), *reh'g granted and opinion vacated sub nom.*
 *People v. Griepp,* 997 F.3d 1258 (2d Cir. 2021), and *on reh'g sub nom.*
 *New York by James v. Griepp*, 11 F.4th 174 (2d Cir. 2021).........*passim*

*People for the Ethical Treatment of Animals, Inc. v. N. Carolina Farm*
 *Bureau Fed'n, Inc.,*
 60 F.4th 815 (4th Cir. 2023)...................................................22

*People v. Dietze,*
 75 N.Y.2d 47 (1989) ..............................................................35

*People v. Golb,*
 23 N.Y.3d 455 (2014) ............................................................34

*People v. Red Rose Rescue, et al.,*
 No. 7:23-cv-04832-KMK (E.D.N.Y. Dec. 7, 2023).................29

*People v. Richards,*
 22 Misc.3d 798 (Crim. Ct. 2008) ....................................7, 30

*People v. Shack,*
 86 N.Y.2d 529, 533 (1995) ..............................................7, 30

*Picard v. Magliano,*
 42 F.4th 89, 98 (2d Cir. 2022) ......................................13, 15

*R.A.V. v. City of St. Paul,*
 505 U.S. 377 (1992) ........................................................25, 27

*Reed v. Town of Gilbert,*
    567 U.S. 155 (2015) ........................................................................24, 25

*United States v. Hill,*
    893 F. Supp. 1034 (N.D. Fla. 1994) .....................................................15

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ........................................................................13, 16

*Texas v. Johnson,*
    491 U.S. 391 (1989) ........................................................................21, 28

*Thornhill v. State of Alabama,*
    310 U.S. 88 (1940) ................................................................................34

*United States v. Alvarez,*
    567 U.S. 709 (2012) ..............................................................................22

*United States v. Kokinda,*
    497 U.S. 720 (1990) ..............................................................................20

*United States v. O'Brien,*
    391 U.S. 367 (1968) ..................................................................14, 24, 26

*United States v. Weslin,*
    156 F.3d 292 (2d Cir. 1998) ................................................................24

*United States v. Williams,*
    553 U.S. 285 (2008) ..............................................................................32

*Vermont v. Am. Booksellers Ass'n, Inc.,*
    484 U.S. 383 (1988) ..............................................................................17

*Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*,
  455 U.S. 489, 495 n.7 (1974) ............................................................31, 33

*Vitagliano v. Cnty. of Westchester*,
  71 F.4th 130 (2d Cir. 2023) ...................................................................15

*Vitagliano* v. *County of Westchester*,
  Supreme Court, No. 23-74......................................................................2

**Statutes**

Chapter 425 of the Laws of Westchester County

§425.21(c) ........................................................................................ passim

§425.21(d)......................................................................................13, 33

§425.31(a) ...............................................................................................24

§425.31(c) ........................................................................................ passim

§425.31(d)..................................................................................................1

§425.31(e) ...............................................................................................24

§425.31(f).................................................................................................24

§425.31(h)..........................................................................15, 21, 23, 30

§425.41 ....................................................................................................10

§425.51 ....................................................................................................10

§425.71 ........................................................................................... 10

Freedom of Access to Clinic Entrances Act

18 U.S.C. § 248(a) ...................................................................... 24

18 U.S.C. §248(e)(4) ................................................................... 34

N.Y. Penal L. § 240.26(3) ........................................................... 33

## Other Authorities

40 Days For Life, "What to say—and not say—to abortion workers,"
May 19, 2021 ........................................................................... 23

Jennifer Rubin, "The fundamental deception behind the 'pro-life'
movement," Washington Post, Dec. 1, 2021 ........................................ 13

Joanna Smith, "Deception used in counseling women against abortion,"
Toronto Star, Aug. 7, 2010 ................................................... 13

Kagan, *Private Speech, Public Purpose: The Role of Governmental
Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413, 455
(1996) ................................................................................... 27

## **INTRODUCTION**

The County's Opposition Brief ("Br.") fails to undermine Plaintiffs' request for preliminarily injunctive relief against Chapter 425's flagrant chilling of their First Amendment free speech.

However, as the parties have proceeded with discovery below, and upon Plaintiffs' further consideration of the Supreme Court's landmark decision this summer in *Counterman v. Colorado*, 600 U.S. 66 (2023), Plaintiffs have informed the County they no longer seek permanent injunctive relief against §425.31(d) (prohibiting threats of force), and the "threat[s] of force" provisions in §425.31(e) & (f).[1] Plaintiffs believe *Counterman* likely provides the necessary protection against mis-application of those terms to their speech, as occurred against pro-life speech in *Griepp I.* (Opening Br. 15.) Thus, Plaintiffs no longer seek a preliminarily injunction against enforcement of those cited provisions, either. They continue to seek preliminary injunctive relief against the remaining challenged provisions.

---

[1] Plaintiffs continue to cite the section numbers as they appeared at the initiation of this suit.

## REPLY TO DEFENDANT'S STATEMENT OF THE CASE

In an earlier round of this litigation, the County adamantly told this Court that Chapter 425's "bubble zone" provision (§425.31(i)) "promotes a substantial government interest that would be achieved *less effectively absent the regulation." 40 Days for Life, et al. v. County of Westchester*, No. 23-155 (2d Cir. April 4, 2023), Brief of Appellee Westchester County, Document 98 at 31. That is, the County defended the bubble zone as *necessary* to promote a litany of purported government interests. *Id.* at 30.

But once the bubble zone provision had entered the shadow of Supreme Court review in the related *Vitagliano* case, and the County faced the prospect of *Hill v. Colorado* being overturned (and with it the bubble zone), the County performed an expedient *volte-face* and hastily repealed it on the ground that it is "*not necessary* to effectuate the intent of Chapter 425," citing public comments agreeing that it "was difficult to enforce and *unnecessary*."[2] *Vitagliano* v. *County of Westchester*, Supreme Court, No. 23-74, County's Brief in Opp., October 25, 2023, at 4-5. That

---

[2] Westchester County Board of Legislators, Video of August 1, 2023 Public Hearing, http://tiny.cc/PHVideo (last visited December 6, 2023.).

the County defended an unnecessary ordinance until it became expedient to *admit* that it was unnecessary calls into question its entire defense of Chapter 425's nest of gratuitous restrictions on sidewalk counseling, based on the First Amendment precedents discussed below.

The County has no response to Plaintiffs' argument that the remaining challenged provisions of the law have nothing to do with the only specific incident the County cited in support of Chapter 425's adoption: trespass by a Catholic priest and two laymen at All Women's Health in White Plains, during which they offered roses, expressions of hope, and literature on alternatives to abortion, for which they were arrested, convicted and jailed under local law. A162.

The County's answering brief fails to show *any* fit, let alone the "close fit between ends and means," *McCullen v. Coakley*, 573 U.S. 464, 486 (2014), the First Amendment requires even under intermediate scrutiny. The County's perfunctory effort to demonstrate a history of allegedly unlawful activity by pro-life advocates warranting Chapter 425's intricate multi-layered web of "gotchas" consists of the following: "Chapter 425 was a response to conduct occurring near reproductive healthcare clinics in the County that exceeded the bounds of protected

First Amendment expression—for instance, blocking facility entrances; pushing past staff; and throwing objects at patients." (Br. 3.)

In support of this claim, the County cites to A169, 172-74, 244-48. *Id.* But beyond a labored recounting of the Red Rose incident, which comprises A161-163, the cited Memorandum to the Board of Legislators merely asserts that, according to "Planned Parenthood staff," someone, somewhere, at some time, allegedly engaged in "blocking facility entrances; pushing past staff; and throwing objects at patients." A164. There is no evidence that this inchoate allegation relates to any unlawful activity by specific individuals in *Westchester County*—or anywhere else for that matter. The County has not provided such details because there aren't any. There is *no* competent evidence of prior unlawful conduct warranting adoption Chapter 425.

The County's remaining citations to the Joint Appendix involve the following:

- the County's declaration that "law enforcement officials across the country and at multiple levels of government are preparing for potential unrest in light of the Supreme Court's anticipated decision to overturn *Roe v. Wade*" (A163);

- another reference to the Red Rose incident (A164);

4

- a double- or triple-hearsay report from the National Abortion Federation, devoid of any reference to the County (A164);

- the mere *ipse dixit* that "it is appropriate to enact legislation to prohibit interference with accessing reproductive health care facilities..." (A165);

- a reference to existing clinic access laws (*id.*);

- a self-serving defense of Chapter 425's provisions (A166-168);

- the Board of Legislators' evidence-free declaration regarding "individuals and/or groups of individuals who may exceed the boundaries of lawful First Amendment expression..." (A173);

- still more belaboring of the Red Rose incident (A245-247).

Yet, buried in the County's misleading citations is clear evidence of

its targeting of pro-life sidewalk counselors:

> The New York State Court of Appeals, *People v. Shack*, found that conduct would not be deemed to have a legitimate purpose *if it continues after a request to cease has been made*. Further, with respect to reproductive health care facilities, **the Second Circuit Court of Appeals, in *New York v. Griepp*,[3] after characterizing the reproductive health context as *particularly delicate*, stated**: "That *sidewalk counseling* constitutes a legitimate First Amendment activity is irrelevant when conduct at issue persists following a request to cease. . . . Defendants may have acted with a legitimate purpose in their first attempt to engage a patient, but once a patient makes an explicit *or implicit request to be*

---

[3] 991 F.3d 81 (2d Cir.), *reh'g granted and opinion vacated sub nom. People v. Griepp,* 997 F.3d 1258 (2d Cir. 2021), and *on reh'g sub nom. New York by James v. Griepp*, 11 F.4th 174 (2d Cir. 2021).

*left alone*, that legitimate purpose is vitiated. (emphasis added)[4]

A167.

Thus stands exposed what was really at work in the adoption of Chapter 425: constitutionally impermissible "protection" of women contemplating abortion from the "unwanted" speech and approach of pro-life sidewalk counselors.

The County's opposition brief now attempts to disavow its reliance on *New York v. Griepp* ("*Griepp I*"), declaring—quite falsely—that "the County did not rely on *Griepp* in enacting Chapter 425." (Br. 7.)

On the contrary, for starters, the above-quoted legislative Memorandum shows that the definition of "harass" at §425.21(c), employed in the "follow and harass" prohibition of §425.31(c), is derived almost verbatim from *Griepp I*. A comparison of the language in *Griepp I* and the text of §425.31 (c) belies the County's representation:

---

[4] All emphasis in this brief is added unless otherwise indicated.

| _Griepp I_ | Chapter 425, §425.31(c) |
|---|---|
| "[A] defendant's intent to **harass, annoy or alarm** may be inferred from the conduct of following a patient or companion at a reproductive health care facility and repeatedly attempting to engage that individual, even for a just a short time, when the individual explicitly **or impliedly requested to be left alone.**" _Griepp I_, 991 F.3d. at 124. | 425.31(c): It shall be unlawful for any person to do the following: … (c) knowingly follow and **harass** another person within twenty-five (25) feet of the premises of a reproductive health care facility or (ii) the entrance or exit of a public parking lot serving a reproductive health care facility… |
| "[D]efendants have a deliberate policy and practice of following patients, companions, and escorts at extremely close distances and continuing to speak with these individuals after express and **implied requests to stop**." _Id._ at 121.<br><br>Defendants **may have acted with a legitimate purpose** in their first attempt to engage a patient, but once a patient makes an explicit or **implicit request to be left alone, that legitimate purpose is vitiated.** _Id._ at 122. | § 425.21(c): "Harass" shall mean to engage in a course of conduct or repeatedly commit conduct or acts that **alarm or seriously annoy** another person and which serve no legitimate purpose. For the purposes of this definition, conduct or **acts that serve no legitimate purpose include, but are not limited to**, conduct or acts that continue after **an express or implied request to cease** has been made. |

The County's reliance on _Griepp I_'s concept of "harassment" extends to reliance on the same plainly inapposite cases on which the _Griepp I_ court relied: _People v. Shack_. 86 N.Y.2d 529, 533 (1995) and _People v. Richards_, 22 Misc.3d 798, 739 (Crim. Ct. 2008), cited at cited in _Griepp I_,

991 F.3d at 120, 121. *See* A167 (Legislation Committee Memo, citing *Shack*), *and* Br. 39 (citing both *Shack* and *Richards*). As noted below, those cases did not involve "[l]eafletting and commenting on matters of public concern," which "lie at the heart of the First Amendment." *McCullen*, 573 U.S. at 489 (cleaned up).

It should be obvious that pro-life sidewalk counseling after an "implied request to cease has been made" would be deemed "seriously annoying" under the *Griepp*-inspired hair-trigger standard of §425.31(c), —and the County again admits it "could." (Br. 25); *accord Griepp I*, 991 F.3d at 122. Thus, even the District Court agreed that Plaintiffs face a credible threat of enforcement with respect to 425.31(c) in light of *Griepp*, SPA13, and the County rightly assumes as much for purposes of this appeal. (Br. 2.) That credible threat plainly arises from the County's borrowing of *Griepp I*'s utterly novel notion of "harassment" applied in a similar context.

Clear evidence of the County's *underlying* content-based targeting is found throughout the legislative history exhaustively documented in the Second Amended Verified Complaint ("SAC"). (A56-82). Particularly revealing is an exchange between Legislator Pierce, County Attorney

Nonna and Assistant County Attorney McLeod, who discuss how, "at the request of the legislators" and the pro-choice "advocates," the definition of "no legitimate purpose" was expanded beyond that in the New York Penal Law to include *protected speech* continuing after an "implied request to cease" so as to address the "concern" that pro-life advocates charged under §425.31(c) could raise the defense that "'it was for a legitimate purpose. We wanted to communicate our opposition to abortion' or something." A66 (SAC ¶¶ 125-126).

Equally false is the County's averment that in Chapter 425 "[t]he meanings of terms like 'physical obstruction,' [and] 'interference'... are derived from other laws and standing decisions, as discussed below. The reference to *Griepp* does not change the language of those terms..." Opp. Br. 7. In light of its view that "[t]here is no statutory carveout for de minimis conduct," the *Griepp I* court adopted the hair-trigger standard for liability advanced by the New York Attorney General. 991 F. 3d at 24. The NY Attorney General then *openly assisted the County in concocting Chapter 425* based on *Griepp I*. *See* A82-83; *Griepp I*, 991 F.3d at 131-34. Chapter 425's enacted terms reflect this influence, as set forth in Plaintiffs' Opening Brief (at 11-17.)

Under these sweeping definitions, not seen in other clinic access laws, virtually any sort of impediment to clinic access, no matter how slight or fleeting, could be deemed to "stop, obstruct, or prevent, through deceptive means *or otherwise*," or to "hinder, restrain, or impede, or… *attempt* to physically hinder, restrain or impede…" That is precisely how *Griepp I* construed the even more narrowly drawn operative terms in existing clinic access laws: "That patients were delayed *at all* is sufficient to establish a violation." *Griepp I*, 991 F. 3d at 105. *See also id.* at 109 ("patient was forced to walk around to the other side of both escorts"); *id.* at 133 ("even *short delays* that force patients *to walk around* a protestor can make access unreasonably difficult or dangerous").

Finally, the County barely addresses the *in terrorem* cumulative effect of vague and overbroad prohibitions on "harassment," "obstruction," and "interference," confusingly interwoven into multiple provisions of the law, combined with:

- heavy fines and imprisonment (§425.41);

- suits for treble damages and attorney fees by anyone claiming to be aggrieved by any alleged violation of Chapter 425—with a five-year statute of limitations, no less—including damages for "pain and suffering, [and] *psychological and emotional distress…*" (§425.51)(emphasis added);

- suits by the County attorney for injunctive and "other appropriate equitable relief" (§425.71);

- and, to top off the *in terrorem* regime, potential "in concert" liability for conduct of others deemed some sort of violation of any of the law's multiple interlinked prohibitions (§425.71) [space removed]

All the County has to say about this merciless legislative piling on is that "None of Chapter 425's provisions regulates protected First Amendment expression; rather, they prohibit specific conduct." Opp. Br. at 37. But with good reason did Plaintiff 40 Days for Life warn its volunteers that "This law is designed to intimidate pro-lifers and scare them off the sidewalks in front of abortion facilities." A294. Mission accomplished. A48-55; 291-292.

The County says "Protest Activity" has "continued"—but it cites almost exclusively to individuals praying and holding signs (Br. 8), not to the *sidewalk counseling* Plaintiffs are seeking to resume. The County also misleadingly says that "individuals" continue to "approach others in cars to pass them literature." (Br. 8.) But the only evidence in the record is a YouTube video of an unaffiliated man leafleting to a vehicle occupant outside a local abortion clinic, before *admitting* later in the video that he

was *"technically in violation of"* the statute. A329.[5] Plaintiffs, on the other hand, assiduously *avoid* violating any laws as part of their pro-life ministry. A27.

Accordingly, the County has done nothing to rebut the factual predicate for Plaintiffs' pre-enforcement challenge to Chapter 425's flagrant chilling of their protected speech. Its attempted legal defense fares no better, as discussed below. The District Court should be reversed.

## ARGUMENT

### I. Pre-Enforcement Standing.

#### A. Individual Plaintiffs.

The County rightly concedes for purposes of this appeal that Hulinsky and Molinelli have pre-enforcement standing against §425.31(c) (follow-and-harass). (Br. 20.) But it wrongly argues the remaining challenged provisions do not plausibly apply to Plaintiffs' speech. The County's position contradicts both controlling precedent and logic.

---

[5] https://www.youtube.com/watch?v=72apkCZLpVA (02:05).

The County argues that Plaintiffs "do not assert that they intend to [] physically obstruct," etc. (Br. 22.) But the Supreme Court has rejected an essentially identical argument in similar contexts—i.e., where governments have argued that rules against making *false* statements do not apply to plaintiffs who intend to make only *true* statements. The Court clarified that the question is whether the "intended conduct was '*arguably* . . . proscribed,' not whether it was *in fact* proscribed under the *best* interpretation of the statute or under the *government's* own interpretation." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) (cleaned up) (quoting and citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014), and *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).[6] This Court also recognizes that a

---

[6] These cases particularly confirm Plaintiffs' pre-enforcement standing against Chapter 425's bans on "interfer[ing] with" reproductive health facility access or operations, i.e., by using "*deceptive* means or otherwise" §425.21(d)),despite Plaintiffs' intent to engage only in *true* pro-life speech. *Cf., e.g.*, Jennifer Rubin, "The fundamental deception behind the 'pro-life' movement, Washington Post, Dec. 1, 2021, https://www.washingtonpost.com/opinions/2021/12/01/fundamental-deception-behind-pro-lifemovement/; Joanna Smith, "Deception used in counseling women against abortion," Toronto Star, Aug. 7, 2010, https://www.thestar.com/news/canada/2010/08/07/deception_used_in_counselling_women_agai
nst_abortion.html.

government's litigation position on a statute's scope does not necessarily "provide meaningful protection" to a pre-enforcement plaintiff. *Id.* at 99. The County's position "applies an especially arid conception" of the "arguably proscribed" standard given the backdrop of *Griepp*, applying FACE's "physical obstruction," "force," and "interference" provisions to pro-life leafleting on a sidewalk at the request of the NY AG—shortly before she helped the County concoct Chapter 425. A82-83.

Further, while the County elsewhere argues (inaccurately) that the enacting legislators' expressed hostility toward pro-life sidewalk counseling is "irrelevant" (Br. 33), it is blackletter law that "[w]hen the issue is simply the *interpretation* of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). Here, the *bulk* of the County's legislators (not a "cherry-picked" few, contrary to the County's argument), including the Legislation Committee and Board Chairs, made clear that Chapter 425's *very purpose* was to apply to sidewalk counseling. (Opening Br. at 10, 48; A56-A82.)

The Seventh Circuit recently looked to similar legislative hostility in finding pre-enforcement standing to challenge Wisconsin's "hunter

harassment law." *Brown v. Kemp*, 86 F.4th 745, 759-60 (7th Cir. 2023) ("[T]he legislative history . . . removes any doubt" that the legislative text was intended to cover the plaintiffs' expressive activities). So, too, here.

Given the foregoing, and the County's insistence that Chapter 425 closely reflects the FACE Act (Br. 29)—which *Griepp I* applied to sidewalk counseling—Plaintiffs' "interpretation is not outside the realm of the 'arguable.'" *Picard*, 42 F.4th at 100.[7]

As to credible threat, the County does not dispute that Chapter 425 is "recent and not moribund," triggering the "low threshold" and "quite forgiving" *presumption* that government will enforce its law. *See Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 138-39 (2d Cir. 2023) (internal quotes omitted). Especially under the "somewhat relaxed standing and ripeness rules" in First Amendment challenges. *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 672, 689 (2d Cir. 2013). All the more so where, as here, the government has not disavowed any intent to

---

[7] Also notable is that courts have deemed "interference" with abortion clinic "escorts" on public sidewalks to be interference with "reproductive health services provided *in . . .* a facility" under FACE, *see, e.g.*, *United States v. Hill*, 893 F. Supp. 1034, 1038-39 (N.D. Fla. 1994), which would trigger Chapter 425's sweeping prohibition of "interference" with undefined "operation[s] of a reproductive health care facility." §425.31(h).

enforce Chapter 425 against these Plaintiffs. *Vitagliano*, 71 F.4th at 138. Indeed, the County doubles down on its *admission* that handing out a pro-life leaflet on a public sidewalk—the most protected form of speech in America, *see McCullen*, 573 U.S. at 489—"*could* violate" §425.31(c), as long as all the other statutory elements [are] also met" (like the flagrantly unconstitutional "implied-request-to-cease" provision). (Br. 25 (emphasis in original).) Further, Chapter 425's broad private-right-of-action and other modes of enforcement, *see supra*, contribute to pre-enforcement standing. *See Susan B. Anthony List*, 573 U.S. at 164-65; *303 Creative v. Elenis*, 600 U.S. 570, 583 (2023).

Finally, the County fails to address the inexplicability of the District Court conclusion that Plaintiffs have pre-enforcement standing against §425.31(c) in light of *Griepp I*, but not as to the remaining challenged provisions the County insists are copy-cats of FACE. Given that *Griepp I also involved enforcement of the FACE Act's* prohibitions on "physical obstruction," "force," and "interfere[nce]" against pro-life sidewalk counselors, it is absurd to conclude that *Griepp I* does not also give rise to a credible threat respecting those *more broadly defined*

provisions here. *See Vermont v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (credible threat where "law is aimed directly at plaintiffs").

## B.    Organizational Plaintiffs.

The County woefully fails to rebut the organizational Plaintiffs' standing. It relies heavily on *Connecticut Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021), where a parent union group lacked organizational standing based on conducting gratuitous "bus tours" and other events in opposition to a particular policy. Given that the bus tours were not one of the organization's "established core activities," it lacked standing. *Id.* at 173-174.

But the County entirely ignores this Court's directly-on-point decision in *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017)—cited by *Russell-Tucker*—where organizational standing existed against an ordinance prohibiting *individual solicitation* of vehicle occupants on a public right right-of-way. *Id.* at 107, 109. It's true that injury to organizational members alone is not necessarily sufficient, *id.* at 109—but there the Court found organizational injury where its members faced additional difficulty in meeting with and organizing laborers (and the prospect of being arrested

themselves under the ordinance), *thus impairing the organization's* core activity of "*counseling*" at the rights-of-way. *Id.* at 111. *That injury alone* was "sufficient to constitute an injury-in-fact." *Id.*

The same is true here for both WP-40DFL and 40DFL. By subjecting the organizations' *members* to criminal and civil consequences for sidewalk counseling in the County, thus making it more difficult to sidewalk counsel, Chapter 425 perceptibly impairs *the organizations'* core activities of sidewalk counseling, which are *in addition to* their activities of waving signs and praying on the sidewalks. A27-29. *See Town of Oyster Bay*, 868 F.3d at 110-111 (organizational standing where policy "impede[s]" organization's ability to meet with day laborers).[8]

## II. Plaintiffs Remain Likely to Succeed on the Merits.

### A. Chapter 425 remains both facially content-based and underpinned with a content-based purpose.

The County argues that Chapter 425 is neither facially content-based nor justified by reference to content. That is wrong. Chapter 425 is facially infected with content-based terms, and legislators' expressed

---

[8] Plaintiffs have also involuntarily diverted resources to maintain their core activity of sidewalk counseling in Westchester County (Opening Br. 37-40), which is an "independent[]" basis for standing. *Town of Oyster Bay*, 868 F.3d at 111.

hostility towards pro-life sidewalk counseling further *confirms* those defects. Chapter 425 must undergo strict scrutiny, which the County does not even address.

### 1. Chapter 425's facial content-based defects.

Starting with §425.31(c), the County argues it applies only to conduct; but "harass" is expressly defined to include "conduct *or acts*" that "alarm or seriously annoy another." §425.21(c). Given that "acts" can plainly encompass speech, the restriction turns on a "listener's reaction" (i.e., serious annoyance *or* alarm), a classic content-based restriction. *McCullen*, 573 U.S. at 481; *see also id.* (law not content-neutral if it addresses "undesirable effects….from the direct impact of speech")(cleaned up).

The County protests that the text does not expressly restrict "speech" or "expression." (Br. 25.) That is an especially perplexing position given the County concession, for this appeal, that Plaintiffs have pre-enforcement standing with respect to §425.31(c). As the County admits, §425.31(c) *"could"* apply to "handing out leaflets" "if an individual ignored a leafletter . . . ." (ECF No. 81, Br. at 23 n.8.) (Br. 25). That is all that matters at this pre-enforcement stage. The County ignores this

Court's recognition that "statutory language prohibiting acts such as interference or *harassment* encompasses verbal as well as physical conduct." *Dorman v. Satti*, 862 F.2d 432, 436-37 (2d Cir. 1988) (internal quotes omitted) (enjoining "hunter harassment" law under First and Fourteenth Amendments).

The County alternatively argues it is the allegedly *non*-expressive aspects of follow-and-harass that must be annoying or alarming. (Br. 24-25.) It also says—astoundingly—that *McCullen*'s "listener reaction" rule was pure dicta. (Id.) First, nothing in the plain text of §425.31(c) specifies that only non-expressive elements of leafleting must be annoying or alarming. Pro-life leafleting on a sidewalk outside of an abortion facility is classic protected expression, *McCullen*, 573 U.S. at 489, which can include walking alongside a woman down a public sidewalk, *Griepp*, 991 F.3d at 136 n.1 (Livingston, C.J., dissenting); *see Frisby v. Shultz*, 487 U.S. 474, 484 (1988) ("[W]e are often captives outside the sanctuary of the home and subject to [others'] speech") (cleaned up). Section 425.31(c) plainly applies if the listener finds *precisely such expression* "seriously annoying"—a manifestly content-based restriction. *See, e.g.*, *United States v. Kokinda*, 497 U.S. 720, 754 (1990) (Brennan, J., dissenting)

(recognizing, for four Justices against plurality decision, that restricting solicitation in even *non-public forum* because it "might annoy" others is content-based). If there were any doubt, the legislative history openly aiming Chapter 425 at the allegedly annoying *content* of pro-life sidewalk speech removes it. *See supra*; *accord Hill v. Colorado*, 530 U.S. 703, 747-48 (2000) (Scalia, J., dissenting) (restricting "annoying" pro-life sidewalk speech is content-based); *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2276 & n.65 (2022) (citing Justice Scalia's *Hill* dissent).

Second, the notion that *McCullen*'s "listener reaction" rule is dicta is obviously wrong. *McCullen held* that the law there would have been content-based *had it turned on listener reaction*, rather than where someone stands, *McCullen*, 573 U.S. at 481, 489-90, consistent with blackletter Supreme Court precedents. *E.g., Texas v. Johnson*, 491 U.S. 391, 408-10 (1989). Section 425.31(c) is thus facially content-based.

But so are the other challenged provisions. The County's argument that §425.31(h)'s prohibition on using "deceptive means" "to stop" "the operation of a reproductive health care facility" is not content-based relies on misapprehension of the false-speech cases. Indeed, the County now admits §425.31(h) targets *false speech* employed to gain entry into a

clinic.[9] (Br. 30-31.) But courts *readily acknowledge that restrictions on false speech are inherently content-based*, as they *necessarily* require enforcement authorities to review the message. *See United States v. Alvarez*, 567 U.S. 709, 716-719 (2012) (plurality); *see also City of Austin, Texas v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 71 (2022). The primary question is whether a "legally cognizable harm associated with a false statement" justifies the restriction, not whether the law is content-neutral. *Alvarez*, 567 U.S. at 719 (plurality).

Section 425.31(h) is also plainly *viewpoint*-based because it prohibits deceptive speech only "to stop"—but not to promote—facility operations. *See Kemp*, 86 F.4th at 781 (prohibition on videoing hunters to "impede or obstruct" rather than laud them was viewpoint-based); *accord People for the Ethical Treatment of Animals, Inc. v. N. Carolina Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 823-24 (4th Cir. 2023). The County's erroneous position that sub (h) is not viewpoint-based because it allegedly targets a legally cognizable harm (Br. 32-33) is a non-

---

[9] As noted, this provision arguably applies to Plaintiffs' speech on the sidewalks, too, given that courts typically assume FACE applies to "escorts" as allegedly integral to reproductive health services *in a facility*. *See, e.g.*, *Allentown Women's Ctr., Inc. v. Sulpizio*, 403 F.Supp.3d 461 (E.D. Pa. 2019).

sequitur; those are separate questions. *See ALDF v. Kelly*, 9 F.4th 1219, 1231-35 (10th Cir. 2021).

With respect to cognizable harm, the County incorrectly attempts to distinguish *Kelly*. It's true the Court there invalidated the false speech restriction because it was insufficiently connected to an *imminent harm* from *false* speech but rather was tied to resulting *true* publicity about what occurred inside the facility. *Id.* at 1234. But the same principle applies analogously here. "Interference with" clinic operations by causing an abortion "escort" or clinic director alleged emotional harm[10] by communicating various "facts" about abortion is certainly considered "deceptive" by many, *see supra*, but controversial speech on matters of public concern is not a legally cognizable harm. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2374 (2018). Therefore, §425.31(h) is not a prohibition on unprotected false speech, but rather on *protected* speech based on content.

The same remains true of §§425.31(a), (e) and (f)—prohibiting use of force or physical obstruction (i.e., leafleting, according to *Griepp I*) "to

---

[10] 40 Days For Life, "What to say—and not say—to abortion workers," May 19, 2021, https://www.40daysforlife.com/en/what-to-sayand-not-sayto-abortion-workers.

prevent" or "to *discourage*" another from obtaining reproductive health services, or "because" they did so. There is no requirment in FACE that one engage in obstruction "to discourage" another from obtaining a reproductive health service. *See* 18 U.S.C. § 248(a). That's an inherently *message-based* distinction undermining the County's reliance on *United States v. Weslin*, deeming FACE content-neutral because "[i]t contains no requirement whatsoever that the offenders intend to communicate a particular message . . . by their obstructive activities." 156 F.3d 292, 297 (2d Cir. 1998). Further, the Supreme Court's clarification that laws are facially content-based where they restrict speech based on its "function or purpose," *Reed v. Town of Gilbert*, 567 U.S. 155, 163 (2015), supersedes any preceding and conflicting lower court precedents. Thus Chapter 425's purpose-based restrictions are facially content-based, too.

## 2. Chapter 425's underlying purpose.

The County, citing *Dobbs*, insists that the County legislators' express content-based purpose is "[i]relevant." (Br. 33.) Wrong again. While "[i]nquiries into congressional motives or purpose" based on the statements of *three total federal representatives* across two houses of Congress "are a hazardous matter," *O'Brien*, 367 U.S. at 382-86,

nevertheless "general judicial reluctance to plumb the legislative psyche does not mandate… turn[ing] a deaf ear to the record that establishes with unmistakable clarity *the actual motives* of the legislators in this case." *Krueger v. City of Pensacola*, 759 F.2d 851, 855-56 (11th Cir. 1985). Thus, the Supreme Court upheld an expressly content-*based* restriction on "adult theater[s]" based on content-*neutral legislative motives*. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986). Then in *Reed*, the Court clarified that "whether a law is content neutral on its face" is a *separate inquiry* from whether it is underpinned by a content-based "justification or purpose." 576 U.S. at 166; *Reagan*, 596 U.S. at 76; *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 394 (1992) (content-based "[s]electivity . . . creat[ing] the possibility that the city is seeking to handicap the expression of particular ideas," is "elevate[d] [] to a certainty" by extratextual statements).

Thus, in *Dorman*, this Court deemed Connecticut's law against "hunter harassment" an invalid content-based restriction *precisely because of its underlying purpose*: "Although the Act would appear by its terms to be content-neutral, . . . it is clearly *designed* to protect hunters from conduct—whether verbal or otherwise—by those opposed to

hunting." *Dorman*, 862 F.2d at 437 (citing *Renton*, 475 U.S. at 68). The County protests that *Dorman* allegedly "did not invalidate the subject law because it was deemed content-based" (Br. 35)—ignoring not only the aforementioned excerpt from *Dorman*, but the *very next sentence*: "to the extent the [] Act can be considered content-based, *it cannot withstand strict scrutiny*." *Id.*

A number of Circuits have recently likewise deemed content-based motives as an important *supplement* in Free Speech cases, notwithstanding *O'Brien*. Plaintiffs' Opening Brief pointed to *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1198 (9th Cir. 2018) as one example. The County responds that *Wasden* allegedly considered (and rejected) legislative animus only in *upholding* one of the subject law's challenged provisions against an Equal Protection claim. (Br. 35.) But the County ignores *Wasden*'s invalidation of a *separate* provision on *Free Speech grounds* in part because it was "so broad that it gives rise to suspicion that it *may have been enacted with an impermissible purpose*," and "we do not ignore that *a vocal number of supporters* were less concerned with the protection of property than… protecting a target group from critical speech." *Wasden*, 878 F.3d at 1198 (citing Kagan,

*Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413, 455 (1996)). The same is true of Chapter 425's astonishingly broad sweep relative to its alleged "precipitating event" (the All Women's clinic trespass). (Opening Br. at 9 n.4; A162.) *See* Kagan, *Private Speech*, 63 U. Chi. L. Rev. at 455 ("[W]hen the asserted interest . . . does not fit the scope of the challenged regulation . . . there is reason, then, to think that the law, though content neutral, has been tainted by an impermissible purpose.").

*Kelly* likewise noted that "legislative history . . . includes express hostility to the sort of investigations ALDF wishes to perform," thus "confirm[ing]" the statute's viewpoint discrimination. *Kelly*, 9 F.4th at 1233. *Kemp* did, also. 86 F.4th at 783.

Again, the same is true here. Chapter 425 is infected with facial content- and viewpoint-based defects. And the overt content-based hostility of a "vocal number of supporters" within the County's small 17-member legislative body[11] "elevate[s]" that conclusion "to a certainty." *R.A.V.*, 505 U.S. at 394. (A56-82.)

---

[11] https://westchesterlegislators.com/legislators-committees.

Thus Chapter 425 must pass strict scrutiny, which the County does not even attempt. (Br. 36-37.) Indeed, protecting others from offensive speech is not a compelling interest. *Johnson*, 491 U.S. at 414. And few laws could be further from a "least restrictive means" than Chapter 425, *Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 666 (2004).

## B.     Chapter 425 also still fails intermediate scrutiny.

Even if Chapter 425 were content-neutral, the County fails to show that it does not burden substantially more speech than necessary to leave "adequate breathing space" for protected expression. *Madsen v. Women's Health Ctr.*, 525 U.S. 754, 768 (1994). The County doubles down on "protecting access to reproductive health care" and "property rights"— interests tied to the law's "precipitating event" of the All Women's incident. But the County does not even attempt to show, as it must, a "close fit" between those interests and Chapter 425. *McCullen*, 573 U.S. at 486.

Indeed, it is now confirmed the County could have readily used alternative means like "targeted injunctions" against actual trespassers. (Opening Br. at 52.) Just yesterday, the Eastern District of New York granted the New York Attorney General a preliminary injunction under

FACE based in part *on the very All Women's trespass* that served as a pretext for Chapter 425. *People v. Red Rose Rescue, et al.*, No. 7:23-cv-04832-KMK (E.D.N.Y. Dec. 7, 2023) (Doc. 55 at 8-10, 48-53) (imposing 15-foot buffer zone on named defendants in the Eastern and Southern Districts for past trespass incidents, in part because of Nov. 27, 2021, trespass at All Women's Health in White Plains). The County could have (and now effectively has) obtained its desired remedy via this much more tailored means, thus ostensibly "restrict[ing] no more speech than necessary." *McCullen*, 573 U.S. at 492.[12]

Finally, the County's only response to Plaintiffs' reliance on *Brown v. City of Pittsburgh*, 586 F.3d 263, 279 (3d Cir. 2009), holding a two-tiered restriction on pro-life sidewalk speech violates intermediate scrutiny, is that Chapter 425 applies only to conduct, not speech. (Br. 37.) That is entirely untrue, as shown by the County's own admissions (with respect to §§425.31(c) & (h)) and in light of *Griepp I*.

---

[12] Plaintiffs *do not* (and need not) concede the aforesaid order complies with the First Amendment, but it is still a devastating example of a less restrictive means the County could have employed. *See McCullen*, 573 U.S. at 491 n.8.

## C. Vagueness and Overbreadth.

Vagueness and overbreadth are "different doctrines," *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006), but the Supreme Court has "traditionally viewed" them "as logically related and similar," *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). Both are concerned with "preventing the chilling of constitutionally protected conduct." *Farrell*, 449 F.3d at 499. Thus, the County's assertion that Plaintiffs' overbreadth argument is "half-hearted" (Br. at 48) misses the mark. Chapter 425's challenged provisions remain vague and overbroad.

First, the County argues that §425.21(c)'s definition of "no legitimate purpose" to include continued "acts" after an "implied request to cease has been made" somehow "**provides *more* specificity**," pointing to cases like *People v. Richards* (aggressive balloon selling) and *People v. Shack* (harassing phone calls) for support. (Br. 39.) But that overlooks the all-important first principle that when a law burdens quintessential First Amendment speech, courts "rigorously" enforce the vagueness test "to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012). And no speech is *more* protected than leafleting on a public sidewalk about a

matter of public concern (in contrast to *balloon-selling* and *harassing phone calls*). *McCullen*, 573 U.S. at 488-49.

In light of *that* principle, §425.21(c) egregiously fails to provide (1) adequate notice as to what is prohibited; and (2) sufficient parameters to avoid arbitrary and discriminatory enforcement. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). The County absurdly responds that people understand the plain meaning of "[i]mply" (detached from the real-world application of that term) but then admits it means "to suggest *rather than say plainly*." (Br. 40.) That is unacceptable in this "sensitive First Amendment context." *Griepp I*, 991 F.3d at 154-55 (Livingston, C.J., dissenting). "[N]o standard" of *actual* "conduct is specified at all." *Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 n.7 (1974). In the words of the Seventh Circuit's decision finding unduly vague a proscription on interfering with hunters by "visual or physical proximity": "The statute is [] silent about who determines when a person is 'close enough' [here, when a person has made an 'implied request to cease']. . . . How is a photographer or videographer [here, a pro-life sidewalk counselor] supposed to know when she is too close? By guessing whether the *hunter perceives her to be interfering* [here, failing to perceive

an 'implied request to cease']?" *Kemp*, 86 F.4th at 773. The County points to examples discussed at a committee meeting (Br. 40)—which do nothing to ameliorate the *text's* lack of adequate notice or standards. The County says a case-by-case application of "implied request" is "unremarkable" (Br. 41), ignoring the rule that "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely *what* that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008).

So, too, here. There are simply no *objective criteria* for determining when "an implied request to cease has been made" in the *real world* on a sidewalk outside an abortion clinic. "Implied request to cease" is egregiously vague.

As to §425.21(c)'s proscription on conduct that "alarm[s]" or "seriously annoy[s]," the County says identical conduct is already prohibited under N.Y. Penal L. § 240.26(3), and that New York's highest court allegedly construes *state* harassment statutes to incorporate a *reasonable* victim standard, citing an inapposite case on "true threats"— not "annoying" speech. (Br. 42.) But, unlike §240.26(3), Plaintiffs are

challenging §425.31(c) (and its definition) in light of its arguable application to their pro-life sidewalk counseling given its specific derivation from *Griepp I*, thus chilling their protected speech. Also, no state court has yet construed §425.21(c) *itself* to incorporate a reasonable victim standard, or any other objective criteria. Thus, the Supreme Court's admonition in *Coates v. Cincinnati* still applies: "annoy[ing]" conduct is an "unascertainable standard" without a limiting state court construction. 402 U.S. 611, 614 (1971).[13]

Section 425.21(d)'s definition of "[i]nterfere with" to mean "to stop . . . through deceptive means *or otherwise*" suffers the same defects. The County's attempted rebuttal tellingly ignores the inherently vague phrase "or otherwise"—a classic example of a term that "has no core." *Village of Hoffman Ests.*, 455 U.S. at 495 n.7. (Br. 44-45.) The County says the "knowing" requirement mitigates any issues, but as the Seventh Circuit recently put it: "When the statute lacks any objective standard .... to determine a potential violator's intent, it provides no check on

---

[13] The County has not requested that the question be certified to an authoritative state court, *cf. Dorman*, 862 F.2d at 435, so this Court should enjoin it under *Coates* and related precedents, at least as applied to Plaintiffs' speech.

official discretion and no guidance to people… trying to comply with the rule." *Kemp*, 86 F.4th at 776. "[O]r otherwise" must surely be DOA.

Chapter 425's prohibitions on "physical obstruction and blocking" to include mere "attempt[s]" to "hinder" or "impede" are likewise vague—particularly without the FACE Act's more precise definitions, *see* 18 U.S.C. §248(e)(4)). *See, e.g., Thornhill v. State of Alabama*, 310 U.S. 88, 100-101 (1940). Here, the County (in light of *Griepp*) expressly sought to "be bold" (A63)—just like hunter proponents in *Kemp* who sought "to push the 'constitutional limits.'" 86 F.4th at 775. The result in *Kemp* was "chilling" plaintiffs into "often *just staying their cars*—lest they commit a crime by crossing a line they cannot discern." *Id.* That's exactly what has happened here. A52-A53 (Hulinsky stays in her car, Molinelli has left the vicinity entirely). *See Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

As to overbreadth, the County attempts to distinguish *People v. Golb*, 23 N.Y.3d 455, 467 (2014) on the ground that the statute there proscribed pure speech that annoys or alarms. But again, Chapter 425 *does* apply to protected speech (and the County *admits* it "could" apply, which is what matters in this pre-enforcement challenge to guard against

chill). The County points to *People v. Dietze*, 75 N.Y.2d 47 (1989), which distinguished between pure speech and "physical conduct and harassment." (Br. 49.) But again, this appeal involves a pre-enforcement challenge to a multi-tiered heap of restrictions in the shadow of *Griepp I*. Plaintiffs seek "adequate breathing space" in *that* context. The County's preference to view technical terms in a factual vacuum is wrong.

## III. Remaining Factors.

### A. Irreparable harm.

The County accuses Plaintiffs of "intentionally misreading" Chapter 425 in their assertion of irreparable harm. On the contrary, that harm flows from "the likelihood of success on the merits . . . often be[ing] the determinate factor" in First Amendment challenges, *New York Progress & Prot. v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013), consistent with *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

That some alleged "protestors" have continued to stand stationary on the sidewalks holding signs or praying is irrelevant. And the County's assertion that sidewalk counseling has continued unabated misrepresents the record. *See supra.*

The County also proffers a veiled redressability argument that Plaintiffs' chill is from the FACE Act, not Chapter 425. (Br. 50.) But even

the few provisions that superficially resemble FACE incorporate far broader and vaguer purpose-based definitions not found *in any other clinic access law*. At any rate, County appears to concede that if Plaintiffs are likely to succeed on the merits, they are suffering irreparable harm. (Br. 51.)

**B.     Balance of Equities and Public Interest.**

For the same reasons, the public interest favors a preliminary injunction. (Opening Br. 61.)

## CONCLUSION

For the foregoing reasons, this Court should REVERSE the District Court and remand with instructions to grant Plaintiffs' motion for preliminary injunction.

Respectfully submitted,

/s/ Christopher A. Ferrara
Christopher A. Ferrara
 Special Counsel – Thomas More Society
148-29 Cross Island Parkway
Whitestone, Queens, New York 11357
Telephone: 718-357-1040
cferrara@thomasmoresociety.org
*Counsel for Plaintiffs*

/s/ Michael G. McHale
Michael G. McHale
Senior Counsel
THOMAS MORE SOCIETY
10506 Burt Circle, Ste. 110
Omaha, NE 68114
Telephone: 402-501-8586
mmchale@thomasmoresociety.org
*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a) and Local Rule 32.1(a)(4) because, excluding the parts of the brief exempted by Fed. R. App. P. 32, this brief contains 6,978 words.

2. This document complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(5)-(7) because this document has been prepared using Microsoft Word in 14-point Century Schoolbook font.

/s/ Michael McHale